## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **GIOVANNI LOYOLA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:21-cv-594-AMM** |
| | ) | |
| **CHRISTOPHER GODBER,** *Jefferson* | ) | |
| *County Sheriff Deputy***, and DEPUTY** | ) | |
| **ASHANTI MCKINNEY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This case is before the court on a motion for summary judgment filed by Defendants Christopher Godber ("Deputy Godber") and Ashanti McKinney ("Deputy McKinney") (collectively, "the Deputies"). Doc. 47. For the reasons explained below, the motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.        BACKGROUND

Facts set forth in the parties' statement of material undisputed facts are deemed admitted for summary judgment purposes unless controverted by the response or reply of the opposing party. Doc. 11 at 18–20. When material facts are captured by body camera footage, the court "view[s] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). Binding precedent

from the Supreme Court dictates that this court "not . . . rel[y]" on the parties' testimony when it conflicts with events that are "depicted by the videotape." *E.g.*, *id*. For purposes of summary judgment, these are the undisputed material facts:

On February 16, 2020, "Deputy Godber and Deputy McKinney received a dispatch call that gunshots had been fired at [Mr. Loyola's mother's r]esidence." Doc. 48 ¶¶ 5, 9, 11; Doc. 52 at 5; *see* Doc. 51-6; Doc. 53-1. Deputy "Godber was the first deputy to arrive [at the residence], followed by [Deputy] McKinney." Doc. 52 at 10 ¶ 2; Doc. 54 at 6.

Deputy "Godber and [Deputy] McKinney were wearing body cameras[.]" Doc. 52 at 13 ¶ 10; Doc. 54 at 7; *see also* Doc. 46-3 at 10, 15. Deputy Godber did not activate his body camera, *see* Doc. 46-3 at 10, 15, and the parties dispute whether that was intentional. *Compare* Doc. 48 at 13 n.6, *with* Doc. 52 at 13 ¶ 10 & n.2. "Deputies are excused from turning on their body cameras if the situation may put other officers or individuals . . . in danger." Doc. 48 ¶ 55; Doc. 52 at 9. Deputy Godber testified that he "got distracted from activating [his] camera" when he arrived at the residence. Doc. 46-3 at 10. The parties agree that Deputy Godber was distracted "because of [a] Hispanic [female] pointing at the [r]esidence and the dispatch call informing the deputies that gunshots were in the area," Doc. 48 ¶ 56; Doc. 52 at 9.

"Deputy McKinney activated his camera while getting out of his vehicle [and] before" interacting with Mr. Loyola. Doc. 48 ¶ 59; Doc. 52 at 9. The view from Deputy McKinney's body camera is initially obstructed, and the parties dispute whether Deputy McKinney obstructed his camera intentionally. *Compare* Doc. 48 at 13 n.6, *with* Doc. 52 at 9 ¶ 63; *compare* Doc. 52 at 13 ¶ 11, *with* Doc. 54 at 7 ¶ 11. Deputy McKinney testified that he did not cover the camera intentionally and that the camera "got blocked" when he was "making sure that [the camera wa]s on." Doc. 46-2 at 19–20.

"Upon arrival at the [r]esidence, Deputy Godber found a Hispanic female near the property who was pointing the deputies toward [Mr. Loyola's] mother's residence." Doc. 48 ¶ 13; Doc. 52 at 5. "Deputy Godber knocked on the [r]esidence and announced that he was with the Jefferson County Sheriff's Office." Doc. 48 ¶ 15; Doc. 52 at 5.

The parties dispute Mr. Loyola's mental state and his conduct when Deputy Godber knocked on the residence. According to the Deputies, Mr. Loyola "was drunk." Doc. 48 ¶ 8; Doc. 46-3 at 40. "Deputy Godber heard loud noises and screaming coming from inside the [r]esidence upon arrival." Doc. 48 ¶ 14; Doc. 46-3 at 31. Deputy McKinney and Deputy White testified that they "didn't hear any arguing." Doc. 46-2 at 21; Doc. 46-5 at 9. The Deputies contend that Mr. Loyola "initially refused to come out of the [r]esidence." Doc. 48 ¶ 16; Doc. 46-3 at 28.

According to Mr. Loyola, he "had . . . a couple of beers th[e] day" of the incident. Doc. 46-1 at 19. Mr. Loyola does not recall the exact number of beers he drank nor the time he started drinking that day. *Id*. at 21. "[P]rior to the deputies getting" to the residence, he was "[j]ust watching TV." *Id*. at 20. "[W]hen [he] heard [Deputy Godber] knock on the door," Mr. Loyola "just opened the door." *Id*.

The parties do not dispute that Mr. Loyola "eventually stepped onto the porch and shut the door behind him." Doc. 48 ¶ 16; Doc. 52 at 5 ¶ 16. "While [Mr. Loyola] stood on the porch, Deputy Godber asked [Mr. Loyola] to come down the stairs so that [Deputy Godber] could pat [Mr. Loyola] down to check for weapons." Doc. 48 ¶ 17; Doc. 52 at 6 ¶ 17.

Thereafter, the parties' narratives materially diverge. Deputy Godber testified as follows: "[A]s [Mr. Loyola] was coming down [the stairs] . . . , [Mr. Loyola] pushed [Deputy Godber]." Doc. 46-3 at 32. Deputy Godber "pushed . . . him back." *Id*. "And then [Mr. Loyola] pushed [Deputy Godber] again." *Id*. "[A]fter that last push, [Deputy] McKinney was able to . . . pull [Mr. Loyola] back, and then the Deputies] were able to get [Mr. Loyola] to the ground." *Id*. at 33. Mr. Loyola "actively resist[ed]" the deputies by "trying to get back up" and "trying to pull away from [them]." *Id*. at 35. "[T]o . . . disorient" Mr. Loyola, Deputy Godber "hit him a couple of times." *Id*. "[B]oth [the Deputies] got [their] cuffs out." *Id*. at 34. They "ended up using [Deputy Godber's] cuffs" to handcuff Mr. Loyola. *Id*.

Mr. Loyola recalled the series of events leading to being handcuffed differently. He testified as follows: Mr. Loyola "answer[ed] the door and didn't get to say or do much of anything" because he "[j]ust got thrown to the floor." Doc. 46-1 at 21. Mr. Loyola did not "shove any of the deputies prior to . . . being taken to the ground" nor did he "initiate any physical contact with the deputies prior to being taken to the ground." *Id*. Mr. Loyola testified that he "got punched while . . . on the ground" but could not "recall which officer it was." *Id*. Mr. Loyola "wasn't trying to resist [the handcuffs] at all." *Id*. at 22.

Deputy McKinney initially testified that "[w]hen [Mr. Loyola] came down [the stairs], he pushed Deputy Godber." Doc. 46-2 at 15. But Deputy McKinney later testified that he "can't remember what caused . . . the physical altercation" between Mr. Loyola and Deputy Godber and that he "can't recall" whether "the pushing start[ed] with [Deputy] Godber pushing" Mr. Loyola or who did "the initial push." *Id*. at 17. But Deputy McKinney also testified that his body camera footage does not include "the initial push that [Mr. Loyola] did to Deputy Godber." *Id*. at 22. Deputy McKinney testified that he "[w]ould . . . be surprised if [Deputy] Godber [ha]d punch[ed Mr. Loyola] a couple of times." *Id*. at 17.

Deputy McKinney's body camera footage does not clearly support the entirety of any party's narrative. "The [body camera] footage . . . has no sound during the first minute . . . ." Doc. 52 at 14 ¶ 15; Doc. 54 at 7. Deputy McKinney testified that

there is a delay between when the body camera is activated and when the audio starts because of "the way that the camera is set up." Doc. 46-2 at 18. Further, the view of Deputy McKinney's body camera footage is initially obstructed. *See* Doc. 51-2 at 00:00–00:07.

The footage begins becoming unobstructed when Mr. Loyola was down the stairs. Doc. 51-2 at 00:07; *see also* Frame 24–203.[1] The footage is completely unobstructed when Mr. Loyola is down the stairs. *See* Frame 244.

At the time the footage view becomes unobstructed, Deputy Godber pushed Mr. Loyola. Doc. 51-2 at 00:00–01:00. Mr. Loyola pushed Deputy Godber. Deputy Godber pushed Mr. Loyola. Deputy Godber pushed Mr. Loyola against a vehicle. Deputy McKinney and Deputy Godber brought Mr. Loyola to the ground. While Mr. Loyola was on the ground, he moved the lower half of his body. Deputy Godber struck Mr. Loyola multiple times above the shoulders. The deputies placed Mr. Loyola in handcuffs.

After Mr. Loyola was placed in handcuffs, the parties' narratives realign. "Deputy Godber [did] not initially double[]lock the handcuffs . . ." Doc. 48 ¶ 41; Doc. 52 at 8 ¶ 41. "[D]ouble[]locking the handcuffs prevents [the handcuffs] from

---

[1] Hereafter, citations to body camera videos are to the approximate minute of the timestamp on screen as the video plays. The court has omitted "*id.*" citations for sentences describing videotaped events that occurred within the same minute as the preceding events. When the court's analysis hinges on specific frames of Deputy McKinney's body camera footage, Doc. 51-2, the court provides a "Frame" citation.

tightening . . . without [the] use of [a] key." Doc. 48 ¶ 42; Doc. 52 at 8; *see also* Doc. 51-10; Doc. 53-4. Although Mr. Loyola disputes that he was combative and resisting arrest, *compare* Doc. 48 ¶¶ 21–23, *with* Doc. 52 at 7 ¶¶ 21–23, the parties agree that "deputies are unable to use the key to double[]lock hand[c]uffs when individuals are resisting arrest," Doc. 48 ¶ 42; Doc. 52 at 8.

"Other deputies [arrived] on the scene after [Deputy] Godber and [Deputy] McKinney arrested [Mr. Loyola,] includ[ing Deputy] White, [Deputy] Fritts, and [Deputy] Matias." Doc. 52 at 10 ¶ 2; Doc. 54 at 6. "Deputy McKinney entered the [r]esidence along with Deputy . . . Fritts . . . to conduct a [search] because gunshots had been reported at the [r]esidence." Doc. 48 ¶ 24; Doc. 52 at 7 ¶ 24. Although the parties disagree whether this search was legal, *compare* Doc. 48 ¶ 24, *with* Doc. 52 at 7 ¶ 24, Mr. Loyola has not asserted a claim related to this search, *see generally* Doc. 29.

"While [other deputies] were in the [r]esidence, Deputy Godber was outside" with Mr. Loyola. Doc. 48 ¶ 25; Doc. 52 at 7 ¶ 25. The parties dispute what Deputy Godber did and said while outside the residence with Mr. Loyola. *Compare* Doc. 48 ¶¶ 29, 32, *with* Doc. 52 at 7–8 ¶¶ 29, 32; *compare* Doc. 52 at 18–19 ¶¶ 33–38, *with*

Doc. 54 at 4 ¶¶ 29, 32, at 8 ¶¶ 32–38. The video footage submitted by the parties provides some clarity.[2]

After Mr. Loyola was handcuffed and outside the view of the deputies' body cameras, Mr. Loyola stated, "I ain't even resisting. Why y'all acting like this (inaudible)?" Doc. 51-2 at 01:00–02:00. Deputy McKinney talked to Mr. Loyola's mother regarding whether there were other occupants in the home. Mr. Loyola's mother was crying. There was shouting coming from outside the house, but much of the shouting is unintelligible on the video footage.

Mr. Loyola said, "It hurts." Deputy Godber said, "Well, that's what happens when you fuck with the police." Doc. 51-2 at 01:00–02:00; Doc. 51-3 at 00:00–01:00. When Deputy Godber listened to the body camera footage, he testified that "[i]t sounded like [he] said, . . . 'That's what happens when you fucking push me.'" Doc. 46-3 at 36. Both Deputy McKinney and Deputy Fritts testified that the audio from the footage sounded like Deputy Godber said, "That's what you get when you fuck with the police." Doc. 46-2 at 30; Doc. 46-4 at 21. Deputy McKinney could not recall what Deputy Godber said without listening to the footage. Doc. 46-2 at 30.

---

[2] Deputy Fritts's body camera footage begins approximately one minute and twenty-four seconds after Deputy McKinney's footage. The video footage taken by Mr. Loyola's mother begins approximately three minutes and five seconds after Deputy Fritts's footage and approximately four minutes and twenty-nine seconds after Deputy McKinney's footage. *Compare* Doc. 51-2 (Deputy McKinney) at 04:42, *with* Doc. 51-3 (Deputy Fritts) at 03:19, *with* Doc. 51-4 (Mr. Loyola's mother) at 00:14.

Mr. Loyola told Deputy Godber to stop using profanity because "this is [his] mom's house." Doc. 51-3 at 00:00–01:00. Mr. Loyola said, "Ow!" Deputy Godber stated, "Next time, do what you're fucking told. Fucking idiot." Deputy McKinney and Deputy Fritts spoke with Mr. Loyola's mother regarding whether there were other occupants in the home. Mr. Loyola spoke with Deputy Godber, but the discussion is unintelligible.

Mr. Loyola asked Deputy Godber, "Why [are you] acting so aggressive?" Doc. 51-3 at 01:00–02:00. Deputy Godber responded, but his response is unintelligible. Mr. Loyola asked Deputy Godber, "Can you please stop using profanity in front of my mother? Can you stop doing that?" Mr. Loyola's mother told Mr. Loyola's brother to come out from the back of the residence. Deputy McKinney and Deputy Fritts entered the residence. Deputy Fritts secured the brother in handcuffs. Deputy McKinney began to search the residence.

Deputy Fritts spoke with Mr. Loyola's brother. Doc. 51-3 at 2:00–3:00. There was shouting coming from outside the house. It is unintelligible. Mr. Loyola's mother went to the door of the residence and spoke with Deputy Godber and Mr. Loyola. Mr. Loyola told his mother, "It's okay, mom." Deputy Godber stood over Mr. Loyola. Deputy McKinney finished his initial search of the residence and joined Deputy Fritts to speak with Mr. Loyola's brother.

Mr. Loyola's mother returned to the door of the residence and began filming Deputy Godber and Mr. Loyola on a cell phone. Doc. 51-4 at 00:00–01:00. Mr. Loyola was laying on the ground on his right side. Deputy Godber stood over him. Mr. Loyola said, "I hear you, but I mean, nobody's fighting no more (inaudible). It's just a family thing." Deputy Godber responded, but his response is not clear. Mr. Loyola asked Deputy Godber another time to stop using profanity in front of his mother.

Deputy Godber said, "Hey, listen to me." Mr. Loyola raised his voice and said, "I hear you." Doc. 51-2 at 04:00–05:00; Doc. 51-3 at 03:00–04:00; Doc. 51-4 at 00:00–01:00. Deputy Godber rolled Mr. Loyola back on to his stomach. Mr. Loyola said, "Ow, man!" Deputy Godber placed his knee on Mr. Loyola's back. Mr. Loyola's mother told Mr. Loyola to "stay quiet." Deputy Godber responded, "He doesn't know how to be fucking quiet."

Deputy Godber readjusted his position. Doc. 51-4 at 00:00–01:00. Mr. Loyola moved his body. Deputy Godber patted Mr. Loyola's hip and said, "I'm not trying to put any pressure on you." A deputy talked to Mr. Loyola's mother. Deputy McKinney and Deputy Fritts talked to Mr. Loyola's brother. Doc. 51-2 at 05:00–06:00; Doc. 51-3 at 04:00–05:00.

There was shouting coming from outside the house. Doc. 51-2 at 05:00–06:00. Deputy Godber told Mr. Loyola, "And I told you that you're going to stay right here.

That's where you're going to fucking stay. You got that?" Deputy Godber and Mr. Loyola continued to speak to each other. It is difficult to understand what they said.

Deputy Godber yelled at Mr. Loyola, "When we tell you to do something, you fucking do it, immediately. You understand that?" Doc. 51-2 at 06:00–07:00. Deputy Godber said in a raised tone, "You were not under arrest at that time. You are now. You will be going to jail now. Do you understand that?" Mr. Loyola responded, "I did not do nothing (inaudible)." Deputy Godber said, "Okay you didn't, but you do now?" Mr. Loyola responded, "I'm not doing nothing, sir."

Mr. Loyola's brother yelled at Deputy Godber, "Get your fucking knee off of him, dumbass." The brother and Deputy Godber yelled. Doc. 51-3 at 05:00–06:00. Mr. Loyola and Deputy Godber spoke to each other in raised tones. Mr. Loyola's brother continued to yell. It is difficult to hear what Deputy Godber and Mr. Loyola said.

Deputy Fritts went outside the residence. Doc. 51-3 at 06:00. "When Deputy Fritts returned outside" the residence, "Deputy Godber and Deputy Fritts helped [Mr. Loyola] stand up on his feet." Doc. 48 ¶ 31; Doc. 52 at 8. "Once [Mr. Loyola] stood up on his feet, he asked Deputy Godber to 'loosen the cuffs a little bit.'" Doc. 48 ¶ 33; Doc. 52 at 8; *see also* Doc. 51-3 at 06:00–08:00. Mr. Loyola "informed Deputy Godber and Deputy Fritts that he had broken his left hand about a year ago in a motorcycle accident." Doc. 48 ¶ 35 (emphasis omitted); Doc. 52 at 8.

11

Deputy Godber examined Mr. Loyola's cuffs. Doc. 51-3 at 07:00–08:00. The parties dispute whether Deputy Godber loosened Mr. Loyola's cuffs during this examination. *Compare* Doc. 48 ¶ 34, *with* Doc. 52 at 8 ¶ 34. Mr. Loyola testified that Deputy Godber did not loosen the cuffs "until [Mr. Loyola] g[o]t[] to the jail or police station." Doc. 46-1 at 24. Deputy Godber testified that he "checked" the handcuffs and may not have loosened them because "[t]he cuffs may have been fine." Doc. 46-3 at 42. Deputy Godber further testified that he "do[es]n't know if [he] loosened [the handcuffs] or not." *Id*.

Mr. Loyola reiterated that "the cuff [wa]s really fucking tight around" his left wrist and "the thought that it had been broken was freaking [him] out" because of his prior injury. Doc. 51-3 at 15:00–16:00. Deputy Godber examined Mr. Loyola's cuffs a second time. Deputy Fritts told Mr. Loyola, "[Deputy Godber]'s going to loosen it for you, okay?" Mr. Loyola said, "Yeah, I appreciate it." After he adjusted the cuffs, Deputy Godber asked Mr. Loyola, "That's not too tight on there, is it?" Doc. 51-3 at 16:00–17:00. Mr. Loyola said, "No."

Deputy Godber continued to adjust the cuffs. Deputy Godber asked Mr. Loyola, "Is that a little bit more comfortable?" Mr. Loyola said, "It's alright." Deputy Godber finished adjusting the handcuffs. Doc. 51-3 at 16:00–17:00. The parties agree that during this final adjustment, "Deputy Godber double[]locked the handcuffs . . . ." Doc. 48 ¶ 38; Doc. 52 at 8.

"Deputy Godber . . . t[oo]k[ Mr. Loyola] to the transport vehicle." Doc. 48 ¶ 38; Doc. 52 at 8. "Deputy Godber asked [Mr. Loyola] if he needed any medical treatment prior to putting him in [the transport] vehicle, but [Mr. Loyola] declined." Doc. 48 ¶ 40; Doc. 52 at 8.

"Deputy White transported [Mr. Loyola] to the jail after the arrest." Doc. 48 ¶ 47; Doc. 52 at 9. Mr. Loyola "never mentioned to Deputy White any issues with the handcuffs being too tight during the . . . car ride." Doc. 48 ¶ 48; Doc. 52 at 9. "When Deputy White arrived at the jail with [Mr. Loyola], Deputy Godber took [Mr. Loyola] into the jail for booking and removed the handcuffs from [Mr. Loyola] at the jail." Doc. 48 ¶ 49; Doc. 52 at 9. "Deputies provided [Mr. Loyola] with the medical questionnaire, and [Mr. Loyola] never mentioned that the handcuffs were too tight in his responses to the questionnaire." Doc. 48 ¶ 50; Doc. 52 at 9.

Mr. Loyola "booked out of Jefferson County Jail on February 18, 2020." Doc. 48 ¶ 52; Doc. 52 at 9. Mr. Loyola was charged with misdemeanor disorderly conduct/disturbing peace, specifically "mak[ing] unreasonable noise." Doc. 51-12 at 2–3; Doc. 46-6 at 2. The Jefferson County Arrest Information Sheet suggests that Mr. Loyola was also charged with resisting arrest. *See* Doc. 46-6 at 2. Upon the district attorney's recommendation, the district judge dismissed with prejudice the criminal charges against Mr. Loyola for "want of prosecution." Doc. 51-13.

Four days after Mr. Loyola "had been arrested," he reported to St. Vincent's East hospital. Doc. 51-1 at 5. "He was having some discoloration [in his fingers] and some intense pain." *Id.* at 5, 11. Initially, Mr. Loyola "had [his] left fingers three through five partially amputated" "due to the poor circulation." *Id.* at 15. Ultimately, Mr. Loyola's "left hand . . . [was] amputated [secondary] to [a] vascular injury following [being] handcuff[ed]." *Id.* at 16. The deputies dispute that "the handcuffing caused any injury to [Mr. Loyola]." *See* Doc. 54 at 9 ¶¶ 47–52.

Mr. Loyola brings this action under 42 U.S.C. § 1983 for unlawful/unreasonable seizure and excessive force. *See* Doc. 29. Deputy Godber and Deputy McKinney moved for summary judgment, asserting that they "are entitled to qualified immunity on all federal claims alleged by [Mr.] Loyola." Doc. 48 at 4; *see also* Doc. 47. The motion is fully briefed. *See* Doc. 48; Doc. 52; Doc. 54.

## II.   STANDARD OF REVIEW

A party moving for summary judgment must establish "that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it could "affect the outcome" of the case. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (cleaned up). A material fact is in "genuine dispute" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (cleaned up).  In deciding a motion for summary judgment, the court's function is

not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (cleaned up).

## III.   ANALYSIS

"Qualified immunity protects government officials performing discretionary functions from civil trials . . . and from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Ireland v. Prummell*, 53 F.4th 1274, 1297 (11th Cir. 2022) (cleaned up). "To receive qualified immunity, the official must first prove that he was acting within the scope of his discretionary authority when the allegedly unlawful conduct took place." *Hamlet v. Martin Corr. Inst.*, No. 21-11937, 2022 WL 16827438, at *3 (11th Cir. Nov. 9, 2022). The deputies assert that they "satisfy th[is] initial burden," Doc. 48 at 17, and Mr. Loyola does not contest this assertion, *see generally* Doc. 52.

"Once an official establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to demonstrate (1) that the facts show that the official violated the plaintiff's constitutional rights and (2) that the law clearly established those rights at the time of the alleged misconduct." *Hamlet*, 2022 WL 16827438, at *3 (cleaned up). Federal courts "may undertake these two inquiries in

either order." *Barcelona v. Burkes*, No. 21-14285, 2022 WL 15137410, at *2 (11th Cir. Oct. 27, 2022) (per curium) (cleaned up); *accord Christmas v. Harris Cnty.*, 51 F.4th 1348, 1354 (11th Cir. 2022) ("Courts are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first.") (cleaned up).

### A. False Arrest (Count 1)

#### 1. Constitutional Violation

"An arrest without a warrant and lacking probable cause violates the Constitution and can underpin a [Section] 1983 claim, but the existence of probable cause at the time of arrest is an absolute bar to a subsequent constitutional challenge to the arrest." *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010). "Probable cause exists where the facts within the collective knowledge of law enforcement officials, derived from reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that a criminal offense has been or is being committed." *Id*. "To receive qualified immunity, an officer need not have actual probable cause, but only 'arguable' probable cause." *Id*. "Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff." *Id*. (cleaned up).

"Whether an officer possesses probable cause or arguable probable cause depends on the elements of the alleged crime and the operative fact pattern." *Id*. at 735. "Showing arguable probable cause does not, however, require proving every element of a crime." *Id*. "If the arresting officer had arguable probable cause to arrest for any offense, qualified immunity will apply." *Id*.

Mr. Loyola was charged with misdemeanor disorderly conduct/disturbing peace and resisting arrest. Doc. 51-12 at 2–3; Doc. 46-6 at 2. Deputy McKinney and Deputy Godber assert that they had "actual probable cause . . . or at least arguable probable cause . . . to arrest" Mr. Loyola for resisting arrest and disorderly conduct. Doc. 48 at 28–31. Mr. Loyola responds that "[the deputies'] arguments for summary judgment hinge on [their] version of disputed facts, ignoring [Mr. Loyola]'s testimony to the contrary and the video evidence." Doc. 52 at 34.

Deputy Godber and Deputy McKinney further assert that "Deputy Godber could have also charged [Mr.] Loyola with more charges when [Mr. Loyola] pushed Deputy Godber, including felony assault of an officer." Doc. 48 at 31. Mr. Loyola responds that "a reasonable jury could credit [his] testimony that he did not initiate physical contact with [Deputy] Godber but[,] rather[,] was shoved by [Deputy] Godber without provocation[] and that when he made contact with [Deputy] Godber after being pushed against the car[,] he was just trying to keep from falling down." Doc. 52 at 36 (cleaned up).

Although Mr. Loyola was charged with misdemeanor disorderly conduct/disturbing peace and resisting arrest, Deputy Godber and Deputy McKinney are "shielded by qualified immunity so long as [they] had probable cause to arrest [Mr. Loyola] for *any* offense." *Durruthy v. Pastor*, 351 F.3d 1080, 1089 n.6 (11th Cir. 2003). The Eleventh Circuit has held that "[t]he validity of an arrest does not turn on the offense announced by the officer at the time of the arrest." *Id.* (cleaned up). Accordingly, the court examines in turn each offense for which Deputy Godber and Deputy McKinney assert they had probable cause or arguable probable cause to arrest Mr. Loyola.

### i. Disorderly Conduct/Unreasonable Noise (Ala. Code § 13A–11–7)

Alabama law provides, in relevant part, that "[a] person commits the crime of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he[] . . . [m]akes unreasonable noise." *Brown*, 608 F.3d at 735 (cleaned up). "Where the disorderly conduct charge is premised upon [the] 'unreasonable noise' proscription, [the court] must consider whether the noise made was unreasonable under the circumstances." *Id.* (citing Ala. Code § 13A–11–7 cmt. ¶ 9 ("Unreasonable was chosen rather than loud as loud noises are sometimes appropriate.")). "The requisite intent may be inferred from the conduct of the defendant." *Brown*, 608 F.3d at 736.

Deputy Godber testified that "the only time [Mr. Loyola] would [have engaged in] disorderly conduct in violation of [Alabama's] statute . . . was when [Mr. Loyola] was with [Deputy Godber] outside." Doc. 46-3 at 53. He further testified that this disorderly conduct charge arose from Mr. Loyola's "yelling and screaming and being loud." *Id*. at 61. Deputy Godber's deposition before Magistrate Harris provides the following narrative: "While Deputies were on [the] scene, [Mr. Loyola] was . . . yelling to the point it caused alarm to the surrounding neighbors[,] causing them to come outside their residences." Doc. 51-7 at 2.

Deputy McKinney testified that he "never heard [Mr. Loyola] make an unreasonable noise" and that "[w]hen [he] was inside [the residence], [he] could . . . hear [Deputy] Godber fussing at" Mr. Loyola and "cursing at" Mr. Loyola. Doc. 46-2 at 30. Although Deputy Fritts initially testified that he "d[id] not recall" hearing "[Deputy] Godber cursing at" Mr. Loyola, he later agreed that Deputy Godber was cursing at Mr. Loyola and "not speaking at a normal tone." Doc. 46-4 at 13, 21, 23. Mr. Loyola testified that he was not "yelling while [he] w[as] on the ground" nor was he "screaming while [he] was on the ground." Doc. 46-1 at 22.

Mr. Loyola contends that he did not make unreasonable noise. *Id*. Deputy McKinney and Deputy Godber dispute between themselves whether Mr. Loyola made unreasonable noise. *Compare* Doc. 46-3 at 61 (Deputy Godber's testimony), *with* Doc. 46-2 at 30 (Deputy McKinney's testimony). There is a genuine dispute of

material fact regarding whether Mr. Loyola made unreasonable noise. Accordingly, the court cannot grant summary judgment on the ground that the deputies had probable cause or arguable probable cause to arrest Mr. Loyola for disorderly conduct for making unreasonable noise.

### ii.     Felony Assault of an Officer (Ala. Code § 13A-6-21)

Deputy Godber testified that Mr. Loyola "committed an assault in the second by pushing" Deputy Godber. Doc. 46-3 at 54. He further testified that "the push [he was] talking about" was "[t]he one that happened first when [Mr. Loyola] was coming down the steps." *Id*. Deputy Godber testified that this push is "not on the video." *Id*. The court presumes that Deputy Godber is referring to Section 13A-6-21 of the Alabama Code, which states "[a] person commits the crime of assault in the second degree if the person . . . [w]ith intent to prevent a peace officer . . . from performing a lawful duty, . . . intends to cause physical injury and" does "cause[] physical injury to any person." Ala. Code § 13A-6-21(a)(4)(a). The court finds that summary judgment is improper on three separate and independent grounds.

*First*, there is a genuine dispute of material fact regarding whether Mr. Loyola pushed Deputy Godber as he was coming down the stairs. Although the deputies assert that "the facts show that [Mr. Loyola] shoved Deputy Godber first prior to any force and/or arrest being used by" the Deputies, the Deputies cite their own testimony for this assertion. Doc. 48 at 29 (citing Doc. 46-2 at 15 (Deputy

McKinney's testimony) and Doc. 46-3 at 31 (Deputy Godber's testimony)). Mr. Loyola testified that he did not "shove any of the deputies prior to . . . being taken to the ground" and that he did not "initiate any physical contact with the deputies." Doc. 46-1 at 21. The court's review of the video footage reveals that the camera's view was obstructed while Mr. Loyola was coming down the steps, *see* Doc. 51-2 at 00:00–01:00; Frame 203–25.

In the absence of clear video testimony to support any party's position, the court would have to make a credibility determination to resolve the conflicting testimony. Binding precedent prohibits this court from doing so. *Serendipity at Sea, LLC v. Underwriters at Lloyd's of London Subscribing to Pol'y No. 187581*, 56 F.4th 1280, 1290 (11th Cir. 2023) ("[A] credibility determination [is] for the jury to make."). Accordingly, there is a genuine dispute of material fact regarding whether the deputies had probable cause or arguable probable cause to arrest Mr. Loyola for felony assault of an officer based on the alleged push not captured in the body camera footage.

*Second*, the court observes that there is a shoving match between Deputy Godber and Mr. Loyola that occurs after Mr. Loyola is down the stairs and is captured by video. *See* Doc. 52-1 at 00:00–1:00; Frame 232–50 (Deputy Godber pushes Mr. Loyola); Frame 257–71 (Mr. Loyola pushes Deputy Godber); Frame 271–83 (Deputy Godber pushes Mr. Loyola). The parties do not discuss the legal

significance of Mr. Loyola's participation in this shoving match. *Compare* Doc. 48, *with* Doc. 52, *and* Doc. 54. In the absence of any argument, it is unclear to the court whether the push captured on video could serve as probable cause or arguable probable cause to arrest Mr. Loyola for felony assault of an officer.

Although Deputy Godber and Deputy McKinney are "shielded by qualified immunity so long as [they] had probable cause to arrest [Mr. Loyola] for *any* offense." *Durruthy*, 351 F.3d at 1089 n.6, the court's probable cause analysis is confined to the grounds that "have been offered" by Deputy Godber and Deputy McKinney, *Manners v. Cannella*, 891 F.3d 959, 969 (11th Cir. 2018). The court is not inclined to find probable cause or arguable probable cause based on arguments that are not raised by the deputies, and it is not clear if the court has the discretion to do so. *See generally*, *e.g.*, *Manners*, 891 F.3d at 969.

"To prevail on a particular theory of liability, a party must present that argument to the district court." *Fils v. City of Aventura*, 647 F.3d 1272, 1284 (11th Cir. 2011). "Our adversarial system requires it; district courts cannot concoct or resurrect arguments neither made nor advanced by the parties." *Id*. In this Circuit, a district court "may not[] . . . act as a [party's] lawyer and construct the party's theory of [the case] from facts never alleged, alluded to, or mentioned during the litigation." *Id*. at 1285 (11th Cir. 2011) (holding that it "was inappropriate" for the district court to craft arguments on a party's behalf in the qualified immunity context).

*Third*, on the present evidentiary record, the court cannot find that either push is eligible for the charge of felony assault of an officer under Alabama law. "The [statutory language] states three elements of the charge of assault in the second degree." *Ex parte Lewis*, 811 So. 2d 485, 487 (Ala. 2001), *overruled on unrelated grounds by Ex parte Seymour*, 946 So. 2d 536 (Ala. 2006). "First, a person must intend to prevent a 'peace officer' . . . from performing a lawful duty." *Id*. "Second, that person must intend to cause physical injury." *Id*. "Third, that person must actually cause physical injury to another person." *Id*. Alabama law defines "physical injury" as "[i]mpairment of physical condition or substantial pain." Ala. Code § 13A-1-2(12). "Showing arguable probable cause does not . . . require proving every element of a crime." *Brown*, 608 F.3d at 735. But the Deputies have not asserted— let alone proven—that any of the three elements of the charge of assault in the second degree are met. *See generally* Doc. 48; Doc. 54; *see also Ex parte Lewis*, 811 So. 2d at 487.

Persuasive appellate precedent explains that in the context of the charge of assaulting an officer, "the definition of physical injury includes a black eye; a busted lip and skint [sic] nose; and several kicks in the groin that hurt for a second." *Burger v. State*, 915 So. 2d 586, 589 (Ala. Crim. App. 2005) (cleaned up). Put differently, Alabama law requires proof of an injury or testimony that an officer has experienced pain. *Id*.

The Deputies did not assert that Deputy Godber suffered an injury or experienced physical pain because of Mr. Loyola's conduct. *Compare* Doc. 48, *and* Doc. 54, *with* Ala. Code § 13A-1-2(12), *and id*. § 13A-6-21(a)(4)(a). Further, the deputies do not assert that Mr. Loyola acted with the specific intent to cause Deputy Godber physical injury. *See generally* Doc. 48; Doc. 54. Mr. Loyola asserts that he did not act with specific intent to harm Deputy Godber during his arrest and "was just trying to keep from falling down." Doc. 52 at 36 (cleaned up); *see also* Doc. 46-1 at 21.

### iii.    Resisting Arrest (Ala. Code § 13A-10-41)

"A person commits the crime of resisting arrest if he intentionally prevents or attempts to prevent a peace officer from affecting a lawful arrest of himself or of another person." Ala. Code § 13A-10-41(a). An individual is not guilty of resisting arrest until that individual is placed under arrest. *See generally*, *e.g.*, *Walker v. City of Mobile*, 508 So. 2d 1209, 1213 (Ala. Crim. App. 1987). The precise moment of Mr. Loyola's arrest is unclear.

According to the body camera footage, Deputy Godber said, "You were not under arrest at that time. You are now. You will be going to jail now. Do you understand that?" Doc. 51-2 at 06:00–07:00. Mr. Loyola responded, "I did not do nothing (inaudible)." Deputy Godber said, "Okay you didn't, but you did now?" Mr. Loyola responded, "I'm not doing nothing, sir." This conversation occurred at least

five minutes after Mr. Loyola allegedly pushed Deputy Godber. *Compare* Doc. 51-2 at 00:00–01:00, *with id*. at 06:00–07:00.

Although the body camera footage appears to reflect that Mr. Loyola was "under arrest" five minutes after he was handcuffed, *see* Doc. 51-2 at 06:00–07:00, Deputy Godber testified that the basis for the resisting arrest charge arose "when [the deputies] were trying to get [Mr. Loyola] in handcuffs." Doc. 46-3 at 61. And the arrest was lawful because Mr. Loyola "had just . . . committed an assault in the second [degree] by pushing" Deputy Godber. *Id*. at 54. As described above, there is a genuine dispute of material fact regarding whether this push occurred. *Compare* Doc. 46-3 at 31–32, *with* Doc. 46-1 at 21. Further, there is a genuine dispute of material fact regarding whether the deputies had probable cause or arguable probable cause to arrest Mr. Loyola for felony assault.

Deputy Godber's deposition before Magistrate Harris provides the following narrative: Mr. Loyola "physically pushed Dep[uty] Godber away from him when trying to detain [Mr. Loyola] while investigating an incident . . . ." Doc. 51-7 at 2. "He attempted to prevent Deputies from placing him in handcuffs by pulling away from them . . . ." *Id*. Although the deputies assert that "[i]t is undisputed that [Mr. Loyola] was resisting" arrest, Doc. 48 at 28, Mr. Loyola testified that he "never resisted at all." Doc. 46-1 at 22. Mr. Loyola further testified that he was not "trying

to get away" from the deputies and was not "jerking around while on the ground." *Id*.

The body camera footage shows that Mr. Loyola moved the lower half of his body while on the ground and prior to being handcuffed. *See* Doc. 51-2 at 00:00–1:00. But at this point in the footage, there is no undisputed basis to arrest Mr. Loyola. Because there is a genuine dispute of material fact regarding when Mr. Loyola was under arrest and whether he resisted the same, the court cannot hold that the deputies had probable cause or arguable probable cause that Mr. Loyola was resisting a lawful arrest.

### 2.  Clearly Established Law

The deputies are "unable to obtain summary judgment on qualified immunity grounds" "[i]f [Mr. Loyola] prevails on both prongs of" the qualified immunity analysis. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004). "But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan*, 572 U.S. at 656.

The deputies assert that "[e]ven if [they] violated [Mr. Loyola's] constitutional rights by unlawfully seizing him for arrest," they "did not violate 'clearly established' law." Doc. 48 at 31 (emphasis omitted). But to grant summary judgment on the basis of the second prong, the court would have to resolve the disputes of fact in the first prong. And if the deputies lacked probable cause to arrest

Mr. Loyola, then his arrest occurred in violation of clearly established law because "it is well established that arrests without probable cause violate the Fourth Amendment." *Grider v. City of Auburn*, 618 F.3d 1240, 1258 (11th Cir. 2010); *accord Barnett v. MacArthur*, 715 F. App'x 894, 907 (11th Cir. 2017). Accordingly, there is a genuine dispute of material fact as to whether the deputies violated clearly established law when they arrested Mr. Loyola, and their motion for summary judgment as to Mr. Loyola's false arrest claim is **DENIED**.

### B. Excessive Force (Count II)

Although Mr. Loyola asserts that his claims must be analyzed separately, *see* Doc. 52 at 23–24, the court disagrees. "Under this Circuit's law . . . a claim that any force in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim." *Bashir v. Rockdale Cnty.*, 445 F.3d 1323, 1331 (11th Cir. 2006) (cleaned up). "The right to make an arrest 'necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'" *Id.* at 1332 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "It follows, then, if an arresting officer does not have the right to make an arrest, he does not have the right to use any degree of force in making that arrest." *Bashir*, 445 F.3d at 1332. "When properly stated, an excessive force claim presents a discrete constitutional violation relating to the manner in which an arrest was

27

carried out, and is independent of whether law enforcement had the power to arrest."
*Id*.

"A claim . . . that the deputies used excessive force in the arrest because they
lacked the right to make the arrest[ ]is not a discrete constitutional violation . . . ."
*Id*. In *Bashir*, the Eleventh Circuit held that the district court properly granted
summary judgment to the officers on the plaintiff's excessive force claim because it
"[wa]s inseparable from his unlawful arrest claim." *Id*. at 1333. The plaintiff
"argue[d that the arresting officer] applied 'excessive force' because any force used
in an illegal arrest is necessarily excessive." *Id*. at 1331.

The caselaw cited by Mr. Loyola does not contradict the principle that a
properly pleaded excessive force claim must exist separately from the false arrest
claim. *See* Doc. 52 at 23–24 (citing *Richmond v. Badia*, 47 F.4th 1172 (11th Cir.
2022)). In *Richmond*, the student-plaintiff "sued [a school resource officer] . . . for,
among other things, false arrest and excessive force under 42 U.S.C. § 1983." 47
F.4th at 1178. "As to false arrest, [the plaintiff] argue[d] that [the school resource
officer] lacked probable cause to seize him." *Id*. at 1180. "As to excessive force, [the
plaintiff] argue[d] that [the school resource officer] used force that was unreasonably
excessive when [the school resource officer] seized him." *Id.*

The Eleventh Circuit "briefly review[ed] the relationship between claims for
false arrest and excessive force." *Id*. at 1179–80. Both claims are "grounded in the

Fourth Amendment's prohibition on unreasonable searches and seizures," but "[u]nlike a false arrest claim, a genuine excessive force claim is not resolved by the existence of probable cause" because "[e]ven when an officer has probable cause for an arrest, the manner in which a search or seizure is conducted must nonetheless comply with the Fourth Amendment." *Id*. at 1180 (cleaned up). The Eleventh Circuit "ha[s] contrasted . . . 'genuine' excessive force claims with artificial claims." *Id*.

"A genuine excessive force claim . . . is not a claim that an officer used reasonable force after committing a distinct Fourth Amendment violation, such as a false arrest." *Id*. (cleaned up). "Instead, it is a claim that—irrespective of an officer's probable cause to make an arrest—the officer used excessive force." *Id*. But "an artificial excessive force claim —that force was excessive merely because another Fourth Amendment violation occurred—is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim." *Id*. (cleaned up).

Mr. Loyola alleges that summary judgment is improper on his excessive force claim because "[a] reasonably jury could . . . credit [Mr. Loyola's] testimony that he did not resist being handcuffed when he was on the ground, particularly as the video merely shows [Mr. Loyola] lying face down while officers manhandle him in various ways, including torquing his wrists and clamping handcuffs so tightly that [Mr. Loyola] permanently lost circulation." Doc. 52 at 29.

Mr. Loyola's argument fails because stated this way, Mr. Loyola's excessive force claim is "artificial," *Richmond*, 47 F.4th at 1180: it suggests that the force exerted by the deputies is excessive because Mr. Loyola did not resist arrest, Doc. 59 at 29, 35. So the deputies lacked probable cause to arrest Mr. Loyola for resisting arrest. *Id*. at 35.

Even if Mr. Loyola has stated a "genuine" excessive force claim "that— irrespective of an officer's probable cause to make an arrest—the officer used excessive force," *Richmond*, 47 F.4th at 1180, summary judgment is proper on this claim. Deputy McKinney and Deputy Godber allege that Mr. Loyola has not suffered a constitutional violation because "[t]he Eleventh Circuit recognizes that the typical arrest involves some force and injury" and that their use of handcuffs was not excessive force. Doc. 48 at 22 (collecting cases). Mr. Loyola responds that "[a] reasonable jury could . . . credit [his] testimony that he did not resist being handcuffed . . . while officers . . . clamp[ed] handcuffs so tightly that [Mr. Loyola] permanently lost circulation." Doc. 52 at 29. On reply, Deputy McKinney and Deputy Godber assert that although "all [Mr. Loyola's] alleged damages for the excessive force claims are related to the handcuffs allegedly being too tight," Mr. Loyola's "Opposition fails to cite any handcuffing cases or address the cases cited" by the deputies in their brief. Doc. 54 at 11.

The Eleventh Circuit has "recognize[d] that the typical arrest involves some force and injury." *Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir. 2002). In this Circuit, the line between permissible and excessive force is drawn where an officer "uses gratuitous . . . force against a suspect who is under control, not resisting, and obeying commands." *Stephens v. DeGiovanni*, 852 F.3d 1298, 1327–28 (11th Cir. 2017).

For example, in *Stephens*, the district court improperly granted summary judgment to an arresting officer based on qualified immunity. *Id*. at 1306. In that case, the officer performed an "investigatory stop," suspecting the plaintiff of burglary. *Id*. at 1320 n.20. Without provocation, the officer "battered [the plaintiff] . . . th[ree] time[s]" before placing the plaintiff in handcuffs. *Id*. at 1308. "Because the handcuffs were quite tight, . . . [the plaintiff] asked [the officer] to loosen the handcuffs." *Id*. The officer "did not adjust the handcuffs on [the plaintiff] for almost three hours." *Id*. The Eleventh Circuit held that the officer's unprovoked battery was a "[g]ratuitous" use of force and fell within the category of "obvious" constitutional violations. *Id*. at 1328–29 & 1327 n.32 (cleaned up). The Eleventh Circuit further held that the tight handcuffing was not a constitutional violation because the plaintiff's "experience with the handcuffs . . . probably did not result in severe or permanent harm and was inconsequential." *Id*. at 1326 n.30.

In *Rodriquez*, the plaintiff alleged that he was arrested with excessive force after a police officer "grabbed [the plaintiff's] left arm, twisted it behind [the plaintiff's] back, and forced it up to just below the shoulder-blade." *Id*. at 1345. The plaintiff "fell to the ground screaming in pain," which the arresting officer "ignored." *Id*. Although "[t]he handcuffing technique used . . . [wa]s a relatively common and ordinarily . . . non-excessive way to detain an arrestee," the plaintiff had a pre-existing injury, and the handcuffing "caused the displacement of a key bone fragment." *Id*. at 1351. "The resulting complications included more than twenty-five subsequent surgeries and ultimately amputation of the arm below the elbow." *Id*. The Eleventh Circuit held that the plaintiff had suffered "no constitutional violation." *Id*.

The Eleventh Circuit began its analysis with the principle that "[p]ainful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal." *Id*. The Court observed that *Rodriquez* presented a factual situation that was "different from [prior precedent] because [the plaintiff's] earlier surgery made what otherwise would be a common non-excessive handcuffing technique . . . a maneuver that caused severe injury and tragic results." But "th[at] distinction . . . [wa]s not importantly legally and d[id] not preclude a conclusion that [the plaintiff] ha[d] shown no constitutional violation." *Id*.  The Eleventh Circuit further explained that federal courts "do not use hindsight to judge the acts of police

officers; [federal courts] look at what the[ officers] knew (or reasonably should have known) at the time of the act." *Id.* at 1351–53. "What would ordinarily be considered reasonable force does not become excessive force when the force aggravates . . . a pre-existing condition the extent of which was unknown to the officer at the time." *Id.* at 1353.

The facts of this case are similar to the facts of *Rodriquez*. There is no dispute that Mr. Loyola's injury was severe and tragic. But handcuffing that "cause[s] severe injury and tragic results" does not convert a "common non-excessive handcuffing technique" into "excessive force." *Id.* at 1352–53. Mr. Loyola does not assert that the deputies used an uncommon handcuffing technique in facilitating his arrest. *See generally* Doc. 52. Further, Mr. Loyola does not allege that the officers exercised gratuitous force comparable to the unprovoked battery in *Stephens*. *Compare Stephens*, 852 F.3d at 1322–24, 1327–28, *with* Doc. 52. Accordingly, the deputies are entitled to qualified immunity for his excessive force claim, and summary judgment is **GRANTED** as to that claim.

## IV.   CONCLUSION

For the foregoing reasons, the motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

**DONE** and **ORDERED** this 13th day of March, 2023.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE